Fuchsberg, J.
(concurring). Literally tens of thousands of our citizens are parties to joint savings accounts.[1] Yet the law relating to it has been in a state of morass, many of the cases which arise being treated very much on an ad hoc basis. Therefore, while I concur in the result here, I believe it well that the legal guidelines that have led me to that conclusion be spelled out.
The Surrogate before whom this very case was tried suggested the following summary for remarks on this subject which he delivered months after his decision here: "Perhaps in no other area of the law governing distribution of decedent’s property has so much confusion arisen as in respect of the rules to apply to a joint bank account when one depositor has withdrawn funds without the consent of the other.” (Gelfand, Litigation in the Surrogate’s Court, NYLJ, May 10, 1974, p 1, col 3, quoting Matter of Kramer, 54 Misc 2d 459, 461 [De Falco, S.]). Even more pointedly, a very recent opinion of the Appellate Division, First Department, the court from whose order the present appeal is taken, said, with respect to joint accounts, "this area of the law requires de novo examination by the Court of Appeals or else legislative consideration” (Moyer v Briggs, 47 AD2d 64, 67).
Before setting out my analysis, I believe it will be useful to state the pertinent facts. Decedent Jessie Lang died on March 31, 1972 at the age of 91. From October, 1963, when her *839 daughter passed away, until August 20, 1970, when she entered a nursing home, Mrs. Lang occupied an apartment alone. During that period, her niece, respondent Harriet Heller, resided in another apartment in the same building. In 1969, decedent opened a savings account at the Bankers Trust Company in the names of the niece and herself as joint tenants with right of survivorship. All the funds ever deposited in the account were decedent’s. She lived at the nursing home until the date of her death.
On August 31, 1970, 11 days after the aunt had moved to the home, the niece withdrew $1,094.90 from the account. In March, 1971, the account was closed when the niece withdrew its entire balance, $5,469.89. At the hearing before the Surrogate, she testified that the $1,094.90 had been withdrawn by bank check and paid to the home for the benefit of her aunt, a claim not borne out by the home’s records. She conceded that the $5,469.89 was transferred by her to an account in the name of her husband and herself. The closing withdrawal of the account was discovered only about a week before the aunt died, when an accountant preparing her tax return had occasion to check at her bank for the amount of interest the account had earned. The aunt’s estate demanded that the niece turn over to it the amount she withdrew in excess of half of the account. The Surrogate decreed that she was required to do so. The Appellate Division, by a divided court, held that she is not.
The phrase "joint tenancy”, when applied to joint bank accounts, has different meanings in different jurisdictions, depending in part on whether its creation and consequences are regulated by common-law principles alone or are subject to particular statutes as well. Such accounts were intended, among other things, to make it easier to effect the transfer of property without the strictures attached to testamentary dispositions. It was intended also to limit the need to comply with technical common law and statutory requisites for gifts, trusts, joint tenancies or contracts (see Inda v Inda, 288 NY 315). However, that quest for simplicity and certainty turned out to be elusive. (See, generally, Kepner, The Joint Survivorship Bank Account—A Concept Without a Name, 41 Cal L Rev 596; Kepner, Five More Years of the Joint Bank Account Muddle, 26 U of Chi L Rev 376; and see Matter of Bricker [Krimer] v Krimer, 13 NY2d 22; Walsh v Keenan, 293 NY 573; Ushinsky v Landis, 23 Misc 2d 87; Matter of Libow, 46 *840 Misc 2d 919 [Bennett, S.]; but see Matter of Filfiley, 63 Misc 2d 824, affd 43 AD2d 981.)
In New York which was the first State to pass a law authorizing payment to the survivor of funds deposited in a joint account (L 1907, ch 247), the controlling legislation (Banking Law, § 675, formerly § 239, subd 3) ended up providing only some, not all, of the characteristics of such an account. One of these, created by the legislation itself, is that the opening of an account in the names of two people in facial form "to be paid or delivered to either, or the survivor of them” evinces an intention to create a "joint tenancy” (Banking Law, § 675, subd [b]), thereby placing the burden of refutation on anyone who challenges it. (Matter of Reardon, 25 AD2d 370.) That does not prevent a joint account from being attacked for fraud, undue influence or lack of capacity, all of which go to its inception, but the burden of proving such a claim still rests on the shoulders of whoever asserts it (Matter of Witter, 270 App Div 447, 450-451, mot for lv to app den 295 NY 994; Matter of Imp, 68 Misc 2d 911, 916). In the present case, despite decedent’s advanced age, no such claims were pressed, nor was any attempt made to overcome the prima facie evidence of intention to create such a tenancy.
Also spelled out by the statute itself is a right of survivor-ship. Though such right is inchoate, some decisions, followed by the majority below, have talked of it in terms of absolute inviolability (Matter of Filfiley, 63 Misc 2d 824, 830, supra [”The survivor must take all”.]). However, they overlook the uniquely hybrid genesis of the law applicable to joint tenancies in bank accounts, the fact that the maturing of the rights of survivorship which accompany them is subject to the contingency of the death of one of the tenants, and the fact that the analogy with joint tenancies in real property, the source of the law of joint tenancies, is more a convenient fiction than a fact, real property hardly having the physically separable character of money (2 American Law of Property, § 6.1, p 7; § 6.4, p 16 et seq.).
Experience indicates that most people who open such accounts, though lacking legal or business sophistication, do understand and intend some ultimate survivorship incident to a joint tenancy, at least with regard to funds remaining in such an account at the time of death. (Sadofski v Williams, 60 NJ 385; Matter of Imp, supra, p 914.) But they do not usually intend the perhaps more crucial fact that, from the moment of *841 the creation of a joint account, a present unconditional property interest in an undivided one half of the moneys deposited devolves upon each tenant (Matter of Filfiley, 63 Misc 2d 824, 825, supra). Even when one of them is the sole donor of the fund, once such a moiety comes into existence it cannot be canceled unilaterally. That consequence is not directly stated in the statute. It results from an application of common-law principles of which most laymen are unaware.[2] It follows that when the aunt opened the account here, the niece, ipso facto, gained title to half the fund. (Matter of Bricker [Krimer] v Krimer, 13 NY2d 22, 27, supra; Marrow v Moskowitz, 255 NY 219; Moskowitz v Marrow, 251 NY 380, 397; O'Connor v Dunnigan, 158 App Div 334, 335, affd 213 NY 676.) The niece’s half interest was not merely a "presumed” one, as the Surrogate here suggested. It was as much hers as the remaining half was the aunt’s, the latter’s being no greater because she was the donor.
Since half of the account was her property, the niece had the right and power to alienate it. For either tenant had the right, during the lifetime of the other, to effectuate such an alienation by withdrawing up to the full amount of her moiety Matter of Bricker [Krimer] v Krimer, 13 NY2d 22, 27, supra; Matter of Suter, 258 NY 104). And, if that is all she had withdrawn, the balance remaining in the account, though it represented the moiety of the aunt, would have remained subject to the niece’s inchoate right of survivorship, despite the fact that the withdrawal of the niece’s own moiety served to destroy her aunt’s right of survivorship in it.
Recognition that such survivorship is destroyed is the product of case law. The statute itself makes no attempt to deal directly with such an event. (Matter of Bricker [Krimer] v Krimer, 13 NY2d 22, 27, supra; Matter of Suter, 138 Misc 85, affd 232 App Div 45, affd 258 NY 104, supra.) And, the only way the aunt could have avoided the one-sideness of the partial obliteration of her inchoate right of survivorship in the niece’s moiety was by withdrawing her own half and, by so *842 destroying what was left of the res, eliminating the niece’s remaining right of survivorship as well.
It is also well established, again by judicial decree in the absence of statutory proviso, that, where a joint tenant withdraws more than his or her moiety, as was the case here, there is an absolute right in the other tenant, during the lifetime of both, to recover such excess. (Matter of Bricker [Krimer] v Krimer, 13 NY2d 22, 27, supra; Walsh v Keenan, 293 NY 573, supra; Matter of Juedel, 280 NY 37; Marrow v Moskowitz, 255 NY 219, supra.) There is no proof the aunt made any effort to do so here; had she done so and recovered, the excess would have come into her possession as her personal property and not that of the joint tenancy. Then, unless she had decided to redeposit it in the original account, hardly likely under such circumstances, so much of her moiety as she had recouped would have been solely hers, free and clear of any inchoate right of survivorship in the niece. And when the aunt predeceased the niece, it is unquestioned that, like all the rest of the property of which she died possessed, it would have become part of the aunt’s estate.
But suppose the aunt, during her lifetime, though reducing her claim against the niece to judgment, had not yet executed upon it or otherwise exercised a possessory right to the amount withdrawn? Should the result be any different? I think not. In Commrade v Commrade (29 AD2d 871), an action between living joint tenants had not been brought to judgment but only to the point of a decision ordering the withdrawing joint tenant to return the excess. Though the successful tenant died before anything further was done, the right of survivorship was held no bar to the enforcement of the decision by the decedent’s estate. Should the result be any different if suit had only been started, but the point of verdict not yet reached? Or if the claim had been asserted, but litigation not yet started? Or even if the claim was not asserted, especially where the decedent was ignorant of the withdrawal, as here? Except as these differences may bear on any relevant matter of intent or consent, again I think not. (See Matter of Bricker [Krimer] v Krimer, 13 NY2d 22, supra; Walsh v Keenan, 293 NY 573, supra.) Instead, the right of survivorship should be regarded as affected to the extent of the entire withdrawal and, without more, unavailable after the aunt’s death as a ground for divesting her estate of its *843 right to recover the amount of the excess withdrawal from the niece.
But that does not end the matter. The niece could successfully have resisted the turnover had the aunt consented to the withdrawal. In that event, she would have been acting in the aunt’s right; the aunt’s moiety would then, in effect, have to be regarded as withdrawn by the aunt herself. Such consent need not have been given in advance; it could have come by way of ratification. It need not have been express; it could have been implied. In short, agreement to the withdrawal could be found to have come about in any number of ways, though most often in such cases it is to be divined from circumstantial evidence of the intent of the one whose moiety was invaded. That intent, it should be made clear, however, speaks to the time of the invasion of the fund, not to the time of the creation of the account, though some of the relevant circumstances may very well be common to both events. Also while it is true that proof of intent may be rendered difficult by the dead man’s statute (CPLR 4519) and by the hearsay rules with respect to decedents’ out-of-court declarations (see Marrow v Moskowitz, 255 NY 219, 221-222, supra), more frequently independent facts and circumstances of sufficient probativeness to determine the matter are at hand.
Thus, in Matter of Leisner (25 AD2d 844, affd 19 NY2d 869), an uncle established a series of joint bank accounts with his niece over a period of six years. During his final hospitalization for terminal cancer, the niece closed the accounts and transferred them to new ones in her name and that of her brother. The close relationship between the parties, in fact as well as by blood, and the known approach of death of the uncle were crucial to the determination by the Appellate Division that the withdrawals were consonant with his wishes. We affirmed.
In Matter of Kessler (55 Misc 2d 17, affd 35 AD2d 710, affd 30 NY2d 821), the joint tenants were husband and wife; the withdrawal by the husband occurred during the wife’s final illness and was redeposited in his own name in trust for her; he had expended large sums of money for her care. Implicit in the court’s decision was the finding of an implied authorization by the wife for the withdrawal by the husband. The marital relationship, the demonstrated devotion of the joint tenants to each other, the withdrawer’s concern for his joint tenant’s welfare, the form of the redeposit and, of course, the *844 anticipated death, all were measuring rods for the determination of whether the survivor’s excess withdrawals were consensual or not.
Other factors which, absent more direct proof, appear to be among those available for consideration in such cases to determine whether the excess withdrawer’s burden of proving consent has been met, are the duration, nature and closeness of the business, social or familial relationship between the tenants; the presence or absence of a habit of freely commingling their funds; significant revelations, if any, in the tenants’ testamentary dispositions; the generosity, or lack of it, manifested by the survivor in his other inter vivos dealings with the decedent; the amounts involved; the pattern of withdrawals; their purpose and timing; the age and physical and mental condition of each at the time of the withdrawal; the source of the funds; the circumstances in which possession of the bankbook came into the hands of the survivor at the time of the withdrawal; decedent’s ignorance or knowledge of the withdrawal and, if the latter, the length of time during which it existed; the protest or lack of protest against the withdrawal; the efforts, if any, to effect its return, considering of course, the absence or presence of opportunity to do so; and, highly important, whether the survivor was the donor.
There are those who prefer not to resort to such indices of agreement for the determination of such cases, favoring instead the supposed greater certainty of a rule under which inviolability of the right of survivorship to all funds withdrawn in excess of tenant’s own moiety is maintained by the legal fiction of regarding the withdrawal as though never made and, therefore, a nullity. (Matter of Filfiley, 63 Misc 2d 824, 830, affd 43 AD2d 981, supra.) Under such a rule, followed here by the majority in the Appellate Division, death would serve to ratify a survivor’s most excessive withdrawals, no matter how unconscionable. Whatever the appropriateness of a "survivor must take all” rule in the context of other types of joint tenants, its force is lost when applied to bank accounts created under section 675. It is preferable, I think, to leave open the area of indicated fact finding at least as to excess withdrawal cases such as the one before us here. Since, as already indicated, so many of these accounts are created as a kind of testamentary substitute,[3] it is highly appropriate that *845 we retain the greater flexibility which a rule directed to the ascertainment of intent provides, rather than a rule whose rigidity makes it more difficult to avoid harsh results.
It is even far from certain that a rule favoring survival of survivorship at all odds will bring greater certainty. It is more likely simply to shift the issue from a determination of intent at the time of withdrawal to whether a joint tenancy was ever intended in the first place. There is nothing academic about such an hypothesis. (Matter of Reardon, 25 AD2d 370, supra; see Third Report Comm. on Estates, 1964; NY Legis Doc, 1964, No. 19, p 366 et seq.)
Matter of Filfiley (63 Misc 2d 824, affd 43 AD2d 981, supra) is itself revealing in that regard. There a mother was donor-creator of a joint tenancy with her daughter. The daughter withdrew the entire account a day before her mother’s expected death. Though Surrogate Sobel, in a scholarly opinion which recognized the ambiguity of our case law, upheld the daughter’s resistance to an attack on her retention of the excess withdrawal on the theory of inviolability of the right of survivorship, it is interesting to observe that the imminent death and the close mother-daughter relationship would no doubt have yielded the same result if the factual yardsticks to which we have alluded had been employed.
So tested, the case before us was not without its own factual texture. One of the two withdrawals involved had taken place when the aunt was 89, the other when she was 90. She did not appear to know of the latter one, which was by far the greater, until about a week before her death, when her accountant discovered it. That withdrawal was not shown to have been made in contemplation of death. In fact, it had been made about a year earlier. It was not made for the aunt’s benefit, but solely to create a new account for the niece and her husband. Significantly, the niece’s testimony before the Surrogate to the effect that the first withdrawal had been used to pay the nursing home for the benefit of the decedent did not find support in the information furnished by the home itself. It is also worth noting that the aunt’s will, under which she bequeathed substantial assets to charity and designated another relative’s husband as executor, made no mention of the niece at all.
These circumstances were sufficient for a factual determination as to whether the niece had sustained her burden of proof that the excess withdrawal was with the direct or implied *846 consent of the aunt or had been ratified by her. Though the Surrogate found she had not met that burden, the Appellate Division’s reversal was based solely on the law. Accordingly, on the foregoing analysis, the order of the Appellate Division should be reversed and the matter remitted for a review of the facts. (CPLR 5613.)
Order reversed, etc.

. "[TJhere are probably more savings accounts in joint or Totten form than in individual names * * * [tjhat the subject is of concern to lawyers is also evident from the litigation over such accounts”. (Sobel, Joint And Totten Savings Accounts, NYLJ, May 8, 1974, p 1, col 5.)

. Thus, it might be well if, by statute or banking regulation, a procedure to better inform depositors of these consequences was required to be employed at the time these accounts are opened. However, in view of the present absence of such requirement, the longstanding existence of the irrevocable moiety rule, and the fact that misunderstanding of it is not universal but it has been relied upon in the opening of many existing accounts, we ought not now cast doubt on the continued viability of the rule itself.

. "These accounts are regarded by people in modest circumstances as a poor man’s will.” (Matter of Edwards, 140 Ore 431, 436; see, also, Treat, Joint Bank Accounts: Poor Man’s Will or Everyman’s Snare, 112 Trusts and Estates 558.)